UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAIR HOUSING JUSTICE CENTER, INC.<br><br>　　　　Plaintiff,<br><br><br><br>　　　　　　　v.<br><br>Brooklyn Boulevard ALP LLC; Queens Boulevard ALP, LLC, Louisiana Purchase LLC, Boulevard ALP Associates LLC, Marx Development Group, LLC, David Marx, and Frances Marx<br><br>　　　　Defendants. | **Case No. 25-1256**<br><br>**COMPLAINT** |

Plaintiff Fair Housing Justice Center, by its attorneys, Eisenberg & Baum, LLP and Mobilization for Justice, Inc., alleges the following for its Complaint against Brooklyn Boulevard ALP LLC; Queens Boulevard ALP, LLC, Boulevard ALP Associates LLC, Marx Development Group LLC, David Marx, and Frances Marx (collectively "Defendants"):

**<u>Introduction</u>**

1.　　　Defendants operate adult care facilities ("ACFs"), which are licensed and funded to provide housing and services to New Yorkers with disabilities.

2.　　　Despite their purpose, Defendants refuse to admit applicants who use wheelchairs and who have incontinence.  Defendants' unlawful policies exclude people with disabilities -- the very people their housing programs are intended to serve.

3.      The Fair Housing Justice Center ("FHJC") started conducting a testing investigation in January 2022, uncovering discriminatory admission policies by Defendants. FHJC testers posing as family members of individuals seeking housing were told that their family members would be refused admission by Defendants due to their disabilities.

4.      When FHJC testers inquired about admission for family members with certain disabilities, admissions staff employed by Defendants discouraged their applications.  A representative for Defendants' facility in Brooklyn told a tester, "We're not going to be able to accommodate the wheelchair in our facility." The representative told another tester, "Somebody does need to be continent....they do need to go to the toilet on their own."  An employee of Defendants' facility in Queens told a tester, "[W]e cannot accept anybody in a wheelchair."

5.      FHJC has uncovered discriminatory statements on Defendants' websites, stating that the facilities do not "accept residents who are chronically in a wheelchair and chronically require the assistance of another person to transfer or ambulate" and that individuals "with chronic unmanaged incontinence are not eligible for residency."

6.      Those baldly discriminatory statements remain on Defendants' websites as of March 3, 2025, nearly two years after FHJC filed a complaint with the New York State Division of Human Rights, putting Defendants on notice that their practices remained discriminatory.

7.      Defendants never offered reasonable accommodations or an interactive process to determine what accommodations the potential applicants with disabilities needed.

8.      Defendants' actions violate the Fair Housing Act, the Rehabilitation Act, the New York State Human Rights Law, and the New York City Human Rights Law.

## Jurisdiction and Venue

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 28 U.S.C. § 2201 and 42 U.S.C. § 3613.  This Court has supplemental jurisdiction over the New York State and City law claims pursuant to 28 U.S.C. § 1367.

10.     Declaratory relief is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. §§ 2201, 42 U.S.C. §12133, 42 U.S.C. § 12188(a), Rule 65 of the Federal Rules of Civil Procedure, N.Y. Exec. Law § 297(9), and N.Y.C. Admin. Code § 8-502.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Plaintiff and all Defendants are incorporated and conduct business in this District. In addition, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.  This Court has supplemental jurisdiction over the New York City law claims pursuant to 28 U.S.C. § 1367.

## The Parties

### The Fair Housing Justice Center

12.     Plaintiff FHJC is a non-profit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region by eliminating housing discrimination and creating open and inclusive communities.  FHJC's principal office is located in the Eastern District of New York.

13.     Among other things, FHJC a) provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; b) provides intake counseling to individuals and organizations who are potentially facing housing discrimination; c) conducts testing and other investigations of allegations of housing

discrimination; d) makes legal referrals to cooperating attorneys; e) assists with the preparation and filing of administrative housing discrimination complaints; and f) provides post-referral litigation support services.  FHJC provides these services free of charge and without regard to income.

14.    As for FHJC's testing and investigational activities, Congress codified the fair housing enforcement present in this case in establishing the Fair Housing Initiatives Program ("FHIP") in Section 561 of the Housing and Community Development Act of 1987, Pub. L. 100-242, 101 Stat. 1942-44 (42 U.S.C. § 3616a).

15.    Specifically, Congress established FHIP to support private nonprofit fair housing enforcement organizations by providing resources to conduct testing and "enforcement activities as appropriate to remedy [] violations." 42 U.S.C. § 3616a; *id.* § 3616a(b)(2)(A)–(E) (listing testing and enforcement activities); 24 C.F.R. §§ 125.103 & 125.401.

16.    The FHJC receives FHIP funding and has for many years.

17.    Eradicating housing discrimination is "a policy Congress considered to be of the highest priority." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972); T*exas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015) (The Fair Housing Act's central purpose is to "eradicate discriminatory practices."); *Meyer v. Holley*, 537 U.S. 280, 290 (2003) ("overriding societal priority"); 42 U.S.C. § 3601 ("policy of the United States to provide . . . for fair housing throughout the United States"). Congress implements this policy and mission through the FHIP Program by authorizing "testing" to "discover and remedy discrimination". 42 U.S.C. § 3616a(b)(2)(A)-(B).

18.    Private non-profit fair housing enforcement organizations under the FHIP, 42 U.S.C. § 3616a, have essentially the same statutory grant to initiate enforcement proceedings as

does HUD, 42 U.S.C. § 3610, the Attorney General, *id.* § 3614, and state and local agencies. *Id.* § 3610(f).[1]

19.    In other words, the fair housing testing under FHIP, which was used in the testing here, constitutes a core business activity of FHJC.

20.    Congress directed that FHIP grant funds be used for "testing", to "discover and remedy discrimination", and to fund "costs and expenses of litigation". 42 U.S.C. § 3616a(b)(2)(A), (B) & (E). FHJC required follow-up testing, which diverted FHJC's use of grant funds from other planned grant activities to conduct follow up tests and to initiate a remedial action to address Defendants' blanket discriminatory rules.

21.    To further its mission of promoting equal housing opportunities for people with disabilities, FHJC engages in a number of additional activities, including helping individuals request reasonable accommodations or reasonable modifications and administering a housing accessibility fund that provides assistance to renters who need reasonable modifications to their housing to make it accessible.

22.    For individuals who need reasonable accommodations or modifications, FHJC helps them draft such requests, obtain related information such as medical support letters, document the response, and provide information about options if the request is denied.

23.    For individuals who require financial assistance with reasonable modifications and may be assisted by the housing access fund, FHJC guides such individuals through the

---

[1] FHIP guidelines for testing and enforcement are set forth in HUD's FHIP Application and Award Policies and Procedures Guide (Sept. 2017) ("AAPP"). The AAPP, like 42 U.S.C. § 3616a, requires grant recipients to seek initiate enforcement actions; request "damages" and "appropriate remedies"; seek reimbursements for "diversion of resources" and "legal expenses"; and for "reimbursement of revolving funds where funds have supported successful litigation." AAPP at 195-196.

application process, works with cooperating architects, and acts as project manager, retaining architects and contractors as needed, communicating with housing providers about coverage of projected costs, and negotiating with housing providers over payment for costs and related contracts.

24.    Thus, Defendants' blanket discriminatory rules impair FHJC's ability to help residents who use wheelchairs or have incontinence to obtain reasonable accommodations or modifications in Defendants' facilities and to obtain assistance from the housing accessibility fund, because the Defendants bar admission of applicants with such disabilities. In other words, to access the fund, a prospective resident would need to access housing in the first instance.

25.    Other FHJC activities include: providing presentations in FHJC's 12-county service area about its services and disability rights under federal, state and local laws; presenting webinars for architects, engineers, developers and attorneys on accessibility requirements of the Fair Housing Act;  attending community center gatherings, housing fairs and other events where FHJC staff can provide information about fair housing laws to consumers; contacting organizations working on disability-related housing issues or with renters or home buyers with disabilities to provide information about federal, state and local fair housing laws and services provided by FHJC, including the housing accessibility fund; and providing legal training for attorneys on housing discrimination matters in partnership with law firms and law schools.

26.    FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

27. FHJC employs individuals as "testers," who are persons that pose as home seekers for the purpose of obtaining information about the conduct of local governments, landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place.

28. FHJC has expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which has diverted resources away from other FHJC activities and the communities it serves.

29. Defendants' discriminatory practices are frustrating FHJC's mission to ensure that all people have equal access to housing opportunities in the greater New York City region by, among other things, making housing unavailable because of disability discrimination. Defendants' discriminatory policies and statements have directly caused FHJC to divert its resources. But for Defendants' conduct, FHJC would not have needed to expend time and money on investigating these specific facilities or educating the public about these issues to combat discrimination against wheelchair users and individuals with incontinence in ACFs.

**The ACF Defendants**

30. Defendant Brooklyn Boulevard ALP LLC operates Brooklyn Boulevard ALP, an ACF located at 636 Louisiana Avenue, Brooklyn, NY 11239. Brooklyn Boulevard ALP ("Brooklyn Boulevard") is licensed as an enriched housing program to house up to 184 residents, including 184 residents in its Assisted Living Program ("ALP").

31. Defendant Queens Boulevard ALP LLC operates Boulevard ALP, an ACF located at 71-61 159th Street, Flushing, NY 11365. Boulevard ALP ("Queens Boulevard") is licensed as an enriched housing program to house up to 239 residents, including 200 residents in its ALP.

32. Defendant Louisiana Purchase LLC is the fee owner of Brooklyn Boulevard ALP.

33. Defendant Boulevard ALP Associates LLC is the fee owner of Boulevard ALP in Queens.

34. Upon information and belief, Defendant Marx Development Group LLC, through its principals David Marx and Frances Marx, has been involved in the development and financing of Boulevard ALP Associates LLC since at least 2010. Upon information and belief, Marx Development Group LLC maintains an ownership interest in Boulevard ALP Associates LLC and exercises control over its policies and practices, including those related to resident admissions. Upon information and belief, David Marx is the owner and chief executive officer of Marx Development Group LLC. Upon information and belief, funding for the development of the ACFs is through David Marx's mortgage companies.

35. Upon information and belief, Defendants Brooklyn Boulevard ALP LLC; Queens Boulevard ALP, LLC, Louisiana Purchase LLC, Boulevard ALP Associates LLC, and Marx Development Group, LLC are New York corporations doing business in the District.

36. In 2010, Boulevard ALP Associates LLC entered a regulatory agreement with the United States Department of Housing and Urban Development, which required it to comply with State and local laws prohibiting discrimination in housing as well as with Federal Housing Administration (FHA) regulations "providing for non-discrimination and equal opportunity in housing." Boulevard ALP Associates LLC constructed the physical plant of its ACF with FHA loans.

## FACTUAL ALLEGATIONS

### Background on ACFs

37.     ACFs were established to provide housing and services to individuals who are "by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, substantially unable to live independently."  N.Y. Soc Serv. Law § 2(21).

38.     Two types of ACFs are Enriched Housing Programs and Adult Homes. *Id*.

39.     ACFs are required to enter admission agreements with their residents, setting the monthly payment for room, board, and services, as well as the services to be provided.  *See* N.Y. Comp. Codes R. & Regs. Tit. 18, § 485.7(d).

40.     ACFs are required to provide an array of services to residents, including supervision, personal care, medication management, and case management.  *See* N.Y.  Comp. Codes R. & Regs. Tit. 18, §§ 487.7, 488.7.

41.     ACFs receive state subsidies through the State Supplemental Payment program. ACF residents who receive federal Supplemental Security Income qualify for a state supplement at a higher rate than individuals living on their own in the community. A person living alone in the community receives a state supplement of $87, bringing their monthly income to $1,030. See N.Y. Soc. Serv. Law § 209(a) and (f). ACF residents receive a state supplement of $694, which provides ACFs with a minimum monthly facility payment of $1,388. *See id.* at § 209(2)(e)-(f); § 131-o. Residents who have other forms of income may agree to pay a higher monthly facility payment.

42.     An ACF may operate an ALP for some or all of its residents.  An ACF must receive approval from the New York State Department of Health to operate an ALP.

43.    ALPs are licensed to serve people who might otherwise require placement in a nursing home. *See* N.Y. Soc Serv. Law § 461-l.

44.    ALPs are required to provide "at a minimum: room, board, housekeeping, supervision, personal care, case management activities and home health services." N.Y Comp. Codes R. & Regs. Tit. 18, § 494.5(a). These services must be provided as part of "an organized, 24-hour-a-day program of supervision, care and services." N.Y. Comp. Codes R. & Regs. Tit. 18, § 494.3(a).

45.    ALPs are reimbursed by federal and state Medicaid funds for the following services: home health aide services; personal emergency response services; nursing services; physical therapy; occupational therapy; speech therapy; medical supplies and equipment not requiring prior authorization; and adult day health care. N.Y. Comp. Codes R. & Regs. Tit. 18 § 494.5(b); N.Y. Soc. Serv. Law § 461-l(e).

46.    In addition to the monthly facility rate that the resident pays for basic services, room, and board, the Medicaid program pays ALPs a daily rate for each resident. *See* N.Y. Soc. Serv. Law § 461-l(1); N.Y. Pub. Health Law § 3614.

47.    Medicaid pays Brooklyn Boulevard ALP between approximately $79.15 and $172.68 per ALP resident per day. See 2023 ALP Rate Schedule, available at:

https://www.health.ny.gov/facilities/long_term_care/reimbursement/alp/alp_2023_min_wage_add-on.htm

48.    Medicaid pays Queens Boulevard ALP between approximately $82.11 and $163.88 per ALP resident per day. *See id.*

**The ACFs' Discriminatory Policies
and Practices Against People Who Use Wheelchairs and/or Have Incontinence**

49.    Both Brooklyn Boulevard ALP and Queens Boulevard ALP have elevators.

50.    Defendants advertise and implement policies refusing to accept applications to both facilities from prospective residents who use wheelchairs.

51.    Defendants advertise and implement policies refusing to accept applications to both facilities from prospective residents who are incontinent.

52.    Defendants deny prospective residents the opportunity to receive assisted living services at both facilities based on their use of wheelchairs.

53.    Defendants deny prospective residents the opportunity to receive assisted living services at both facilities based on their incontinence.

54.    Defendants make oral and written statements that discriminate against people who use wheelchairs and against people who are incontinent.

55.    Upon information and belief, Defendants fail to offer reasonable accommodations or engage in a cooperative dialogue regarding prospective residents' needs for reasonable accommodations.

**Testing Investigations**

**The Brooklyn Boulevard Investigation**

56.    After receiving an allegation of discrimination on the basis of wheelchair use,[2] FHJC started a testing investigation on or around January 21, 2022, assigning a tester to pose as someone inquiring about the availability of apartments for her brother.  On or around January 27, 2022, a tester, S.B., spoke to "Adina Palmer," the "Marketing/Admissions Director" at Brooklyn Boulevard ALP.

---

[2] This test was conducted in response to an allegation from a complainant in June 2020 that was reported to FHJC.

57.    The tester asked about "the level of care," noting that her brother lives very independently but perhaps should not be living alone anymore.  The tester asked for information on costs, meal plan, and social activities.  Ms. Palmer responded: "[R]esidents must be ambulatory. That means that they have to be able to walk either with a cane or rollator. But they have to be able to walk independently." The tester explained: "[H]e's been in a wheelchair for many years… he's pretty good, but he does use a wheelchair." Ms. Palmer responded: "We're not going to be able to accommodate the wheelchair in our facility." She further explained, "He wouldn't be able to bring the wheelchair with him."

58.    S.B. inquired about activities off-site and whether he'd have to be on the first floor. The tester specifically asked: "Your elevator may or may not accommodate a wheelchair, then, or…? Without offering specific answers to the tester's inquiries, Ms. Palmer stated: "The wheelchair wouldn't be in the building."

59.    Before ending the call, Ms. Palmer offered to e-mail S.B. "a resource for other assisted living facilities."

60.    On January 31, 2022, the FHJC assigned a different tester, L.D., to pose as someone inquiring about availability of apartments for her mother-in-law. She reached Ms. Palmer, who asked: "How does your mother-in-law ambulate? How does she get around? Does she have a walker, cane, rollator?" The tester responded that her mother-in-law is ambulatory, and that she lives on her own, and could use help remembering to take her medications and eat. Ms. Palmer responded, "OK, no problem. I'll be happy to give you all the information."

61.    About ten minutes into the phone call, L.D. asked what kind of medical and non-medical services were available.  Ms. Palmer stated: "The primary assistance that we provide are really what somebody would receive from a home attendant with the exception of wheelchair

services and incontinence care. Wheelchairs would not fit in our facility. And somebody does need to be continent, meaning it's ok if they are wearing pampers. A lot of times they wear pampers just for emergencies. But they should not . . . there is a difference between just wearing a pamper overnight just for an emergency, and actually, only using pampers. Like exclusively, and not using the bathroom. They do need to go to the toilet on their own. We do have home attendants that can come to assist them. Let's say they're having trouble reaching something in the bathroom. Home attendants could come, but if diaper changes are required, that level of care, usually, it's a whole level of care, it's a whole package in itself. And that wouldn't be what our facility is, because we're an assisted living, not a nursing home."

62.    After confirming that L.D.'s mother-in-law is ambulatory, Ms. Palmer offered to send a video, brochures for the facility, an in-person tour, an assessment, and her business card.

63.    On February 2, 2022, the FHJC assigned a tester, K.M., to pose as someone inquiring about the availability of apartments for her aunt. On February 14, 2022, the tester spoke to Ms. Palmer, telling her that her aunt needs help with meals, socialization and medications, and someone to check on her. Ms. Palmer responded, "Everything you said about your aunt is literally like everything I need to hear." Ms. Palmer explained that services offered include assistance with medication, home care services during the day, and housekeeping, and encouraged K.M. to bring her aunt in for a tour. She also offered to send K.M. a video of two-bedroom apartments and texted her a brochure for the facility and her business card. When discussing whether her aunt would be able to age in place, Ms. Palmer stated that concept applied more in private homes and that assisted living was "about safety." Ms. Palmer told the tester if her aunt became a fall risk and was "not steady on her feet anymore" that would be the time to look into a nursing home.

64.     FHJC also assigned a tester, K.H., to pose as someone inquiring about availability of apartments for her father-in-law. On February 15, 2022, on the phone, Ms. Palmer asked "[H]ow does he ambulate? Does he use a walker, a cane, a rollator?" The tester further stated: "He is able to, you know, he doesn't need assistance – he can transfer himself really well. He's very strong in that way." Ms. Palmer said, "[W]e don't really have wheelchairs in our facility so that is a big issue actually." After the tester asked why, Ms. Palmer responded: "Residents need to be able to walk either with a cane or a rollator. We don't push residents in our facility. So it would be a big issue...We don't really provide that level of care. And our home attendants wouldn't be pushing them in a wheelchair." The tester told Ms. Palmer, "[H]e doesn't need assistance with being pushed in the wheelchair. He uses a powerchair mostly. And he can transfer himself in and out of the chair into a bed or whatever." Ms. Palmer asked "There's no way he could try to learn how to use a rollator?" A few moments later, she said, "Most assisted livings don't usually have wheelchairs." She said this is because "[i]t's a certain level of care […] sounds like he needs a higher level of care." She further stated, "I mean, we're wheelchair accessible....We do have a few residents who use scooters but they're only allowed outdoors...Our facility is really not designed for constant wheelchair use."   She advised K.H., "I'm more than happy to refer you to other places that I think might be a little more wheelchair-compatible."  She suggested a facility in the Bronx where she said she was "pretty sure they allow a wheelchair," though K.H. said she was looking in Brooklyn, where her father-in-law has lived for thirty years.  She e-mailed K.H. a guide with listings of other facilities and the card for senior care advisor to find other facilities.

65.     During the course of its investigation of the Boulevard ACFs, FHJC uncovered identical discriminatory statements on each of their websites' "FAQ's" sections: "I am confined

to a wheelchair, can I still reside at Boulevard ALP?  Unfortunately, Boulevard ALP is unable to accept residents who are chronically in a wheelchair and chronically require the assistance of another person to transfer or ambulate." *See* Exhibit A.

66.    In addition, each website's FAQs and the Boulevard admissions packet contain the following statement: "Can a person with incontinence live at Boulevard ALP? If the incontinence is managed then a person may be eligible for residency at Boulevard ALP.  A person with chronic <u>unmanaged</u> incontinence is not eligible for residency at Boulevard ALP." *See* Exhibit B.

## The Queens Boulevard Investigation

67.    On February 15, 2022, the FHJC assigned a tester, U.C., to pose as someone inquiring about availability of apartments for his aunt. On February 16, 2022, the tester reached an employee named Elinor Taasa in the "Marketing and Admissions" department. After initially discussing services provided and the admissions process, the tester said: "Just one other thing, she's in a wheelchair...will that work?" He further clarified: "[S]he's able to get out of the wheelchair and do what she needs to do..." Ms. Taasa responded: "The thing is, we don't have anybody here on wheelchairs. We don't have anybody to assist with the wheelchairs."  U.C. explained that his aunt used an electric wheelchair, and that she can transfer independently. After some discussion, Ms. Taasa said, "We can meet her, we can show her around.  We can see how she walks if she chooses to . . . She'll be the only one if she has [a wheelchair]"  She invited U.C. to call back after speaking with his aunt.

68.    During a subsequent conversation, Elinor suggested that wheelchair access was feasible: "I spoke to our Director and everything. So basically, yeah, it's fine, but we have to evaluate. So we'd have to see her, just like we have to see all the other potential residents. And

we'll take it from there."  This statement contradicted the discriminatory statements and materials published online, which reflect a categorical prohibition on admitting people who use wheelchairs.

69.     On February 23, 2022, U.C. called Ms. Taasa back. The tester said that his aunt looked at the website and saw a statement that Boulevard ALP Queens does not take people in wheelchairs. The tester said his aunt's main question is whether the assessment would require her to walk . Ms. Taasa responded: "Yes, I looked into it.  It would require her to be able to walk. And we cannot accept anybody in a wheelchair. So what you read is correct."   When U.C. asked how many steps his aunt would need to walk, Ms. Taasa responded, "At least 200 feet."

70.     On March 2, 2022, the FHJC assigned a tester, A.C., to pose as someone inquiring about availability of apartments for her great-aunt. On March 4, 2022, A.C. reached an employee who identified herself as Ms. Taasa.  A.C. told Ms. Taasa "My aunt is a wheelchair user. Do you know if that's something, you know, you're accessible to?" Ms. Taasa responded: "So, we're not. The residents have to be able to walk with a walker or a rollator.....We just don't accept with a wheelchair." She added: "You can refer to that on our website as well." She concluded the call by clarifying that there is no one in the facility who uses a wheelchair, but that she would "doublecheck" about the wheelchair issue.

71.     On March 7, 2022, the FHJC assigned a test coordinator, A.H., to pose as the sister of tester A.C., seeking clarification about the facility's wheelchair access for her great-aunt. She reached Ms. Taasa. This time, Ms. Taasa said, "I spoke to our Director and everything […] basically, yeah, it's fine, but we have to evaluate. So we'd have to see her, just like we have to see all the other potential residents." The tester asked: "And what does that mean, 'to evaluate'?" Ms. Taasa responded: "So basically we speak to the potential resident, we look at

their medication list if they have it. We have them either walk for us or whatever, however way they can ambulate. We show them the facility. We explain how everything works. We always meet the potential resident." She added that the assessment may lead to the prospective resident themselves deciding that "it's too much for me". She added that if someone is "not stable enough" […] we would tell them that we don't think that this person is appropriate. They need a higher level of care […] various things come into play."

72.     The website continued to state, as it does as of March 3, 2025, "Boulevard ALP is unable to accept residents who are chronically in a wheelchair and chronically require the assistance of another person to transfer or ambulate." *See* Exhibit A.

73.     On March 9, 2022, the FHJC assigned a tester, C.B., to pose as someone inquiring about availability of apartments for her mother-in-law. She reached Ms. Taasa. After some introductory questions relating to the admissions process and age of the tester's mother-in-law, Ms. Taasa asked: "Is she able to walk?" C.B. said yes. Ms. Taasa continued providing information, offering to provide a tour, and adding later that her mother-in-law "sounds like she's a good candidate."

74.     On February 21, 2023, FHJC conducted further research into Boulevard ALP Queens to determine whether they continued to publish discriminatory statements on their website. FHJC determined that Boulevard ALP Queens continued to post a statement saying that people who use wheelchairs will not be admitted to their facility. FHJC further discovered an admissions packet available for download on Boulevard ALP Queens's website repeating the discriminatory statement.

75.     FHJC has continued to check the website of the Boulevard ACFs regularly to verify whether the facilities have maintained postings of discriminatory statements.

Unfortunately, they have. The discriminatory statements in the facilities' FAQs are still posted as of today. Defendants' discriminatory policies and practices, as evidenced by their website statements and interactions with testers, constitute an ongoing pattern of discrimination that has continued from at least February 2022 through the present day.

76.    Given the prior tests and the website statements, there is evidence of an ongoing policy or practice of discrimination, and these unlawful practices have continued to date. In other words, there is an ongoing policy, and there were prior acts taken in furtherance of that policy, as evidenced by the testing.

77.    Accordingly, a categorical prohibition to admit applicants who use wheelchairs and who have incontinence falsely conveys to prospective tenants that an individualized assessment is not available under governing law. Such false information directly interferes with FHJC's mission and core business activities, including, among other things, a) the provision of information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; and b) the provision of intake counseling to individuals and organizations who are potentially facing housing discrimination.

**Complaints to the New York State Division of Human Rights**

78.    On February 24, 2023, FHJC filed complaints with the New York State Division of Human Rights ("Division of Human Rights") against Defendants alleging discrimination on the basis of wheelchair use in violation of the New York State Human Rights Law, based on the discriminatory conduct and statements uncovered during FHJC's testing investigation.

79.    Throughout the course of the Division of Human Rights' investigation of FHJC's complaints, Defendants maintained the discriminatory statements on their websites' FAQs unchanged.

80.     Upon information and belief, Defendants never responded to the Division of Human Rights' effort to settle the claims.

81.     On March 8, 2024, the Division of Human Rights issued its final Investigation Reports and Basis of Determination, with a finding of probable cause that Defendants discriminated on the basis of disability, specifically disabilities that require wheelchair use.

82.     The Division of Human Rights' reports noted that its Basis for Determination included recordings of statements by Defendants to FHJC testers as well as policies posted on Defendants' websites.

83.     On July 16, 2024, FHJC requested that the complaints with the Division of Human Rights be dismissed for administrative convenience to pursue claims in federal court. Defendants failed to timely object to FHJC's request.

84.     On October 7, 2024, the Division of Human Rights granted FHJC's request, dismissing the complaints against Defendants.

85.     Even after the Division's findings of probable cause, Defendants have continued to maintain discriminatory statements on their websites, amplifying Defendants' intentional discrimination.

## <u>COUNT I</u>
Fair Housing Act:
Discrimination based on Disability
U.S.C. § 3601 *et seq.*

86.     Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

87.     Defendants own and lease dwellings, as defined by Section 802(b) of the Fair Housing Act, 42 U.S.C. § 3602(b), to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

88.    Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).

89.    Defendants' conduct, as described above, constitutes representations made because of disability that a dwelling is not available for inspection or rent when such dwelling was in fact so available, in violation of Section 804(d) of the Fair Housing Act, 42 U.S.C. § 3604(d).

90.    Defendants' conduct, as described above, constitutes discrimination in the rental, or to otherwise make unavailable or deny, a dwelling to a renter because of disability, in violation of Section 804(f)(1) of the Fair Housing Act, 42 U.S.C. § 3604(f)(1).

91.    Defendants' conduct, as described above, constitutes discrimination against any person in the terms, conditions, or privileges of rental of a dwelling because of disability, in violation of Section 804(f)(2) of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

92.    Defendants' conduct, as described above, further constitutes discrimination against persons with disabilities by refusing to make reasonable accommodations—or even consider reasonable accommodation—in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling in violation of Section 804(f)(3)(B) of the FHA, 42 U.S.C. § 3604(f)(3)(B).

93.    Defendants rejected test applicants based on their need or desire to use a wheelchair (manual or electric) without making any reasonable accommodations—or even considering reasonable accommodations—that would allow the test applicants access to Defendants' facilities.  Defendants discouraged applications by people with incontinence who

might require accommodations. Instead, testers' relatives were refused accommodation. For example, when FHJC testers inquired about accommodations for wheelchair users, Defendants' staff categorically rejected the possibility without engaging in any interactive process to determine what accommodations might be necessary or feasible. Defendants failed to consider potential accommodations such as providing additional staff training on assisting wheelchair users, modifying certain physical spaces to improve accessibility, or adjusting care plans to address incontinence needs.

94.    Defendants' conduct, as described above, further constitutes discrimination against persons with disabilities by making unlawful inquiries into the nature and severity of an individual's disability in violation of 42 U.S.C. § 3604(f) as implemented by 24 C.F.R. §100.201(c).

95.    Plaintiff is an aggrieved person as defined in 42 U.S.C. § 3602(i). Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

96.    Defendants' conduct is intentional, willful, and made in disregard for the rights of others.

97.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT II
### Rehabilitation Act:
### Discrimination based on Disability by the Federally Funded Defendants

98.    Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

99.    Certain of Defendants' programs and activities receive federal financial assistance through the Medicaid program. Specifically, Defendants Brooklyn Boulevard ALP LLC and

Queens Boulevard ALP LLC receive federal financial assistance through Medicaid reimbursements for their Assisted Living Program services. These Medicaid funds are used to provide housing and care services to residents, including those services that Defendants claim they cannot provide to wheelchair users or individuals with incontinence.

100.    The Rehabilitation Act prohibits entities that receive federal financial assistance from discriminating against people with disabilities. 29 U.S.C. § 794a (as amended).

101.    Individuals who use wheelchairs and other mobility devices qualify as individuals with disabilities under the Rehabilitation Act.

102.    Individuals who are incontinent qualify as individuals with disabilities under the Rehabilitation Act.

103.    As set forth above, Defendants discriminated against and continue to discriminate against qualified individuals with disabilities who use wheelchairs or other mobility devices by refusing to admit them or retain them in their ACFs as a result of their disability.

104.    As set forth above, Defendants discriminated against and continue to discriminate against qualified individuals with disabilities who are incontinent by refusing to admit them or retain them in their ACFs as a result of their disability.

105.    These Defendants' conduct, as set forth above, violates several provisions of the Rehabilitation Act.

106.    For one, the Rehabilitation Act requires that Defendants administer their programs in a manner that does not discriminate against people with disabilities and requires that they provide people with disabilities equal access to benefits and services.

107.    It further prohibits Defendants from "utiliz[ing] criteria or methods of administration the purpose or effect of which would … [d]efeat or substantially impair the

accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap. . . ."  24 C.F.R. § 8.4(b)(4).

108.    Defendants violate at least these provisions of the Rehabilitation Act by continuing to refuse to admit or to retain disabled individuals who require the use of a wheelchair (manual or electric) or who are incontinent.

109.    Moreover, Defendants are required to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability.  29 U.S.C. § 794; 24 C.F.R. §§ 8.3, 8.4, and 8.20.

110.    Defendants have failed to make reasonable accommodations for individuals with mobility disabilities, including those who use wheelchairs (manual or electric) and those who are incontinent by failing to make changes to their policies, practices, or procedures that are necessary for those individuals to participate in and enjoy the benefits of their ACFs and ALPs.

111.    Plaintiff FHJC is a "person aggrieved" under the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and has been injured by the federally funded Defendants' discriminatory conduct and has suffered damages.

112.    Plaintiff FHJC is entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs.  29 U.S.C.A. § 794a.

## **COUNT III**
New York State Human Rights Law
(New York Administrative Code § 296 *et seq*.)

113.    Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

114.    Defendants own and lease housing accommodations, as defined by Article 15 of the New York Executive Law Section § 292(10) to include "any building . . . which is used or occupied . . . as the home, residence or sleeping place of one or more human beings."

115.    Defendants' conduct, as described above, constitutes refusing to rent or lease, or otherwise denying or withholding a housing accommodation or the representation that a housing accommodation is not available for inspection, rental, or lease when in fact it is so available, based on disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

116.    Defendants' conduct, as described above, constitutes discrimination in the terms, conditions or privileges of rental or lease of a housing accommodation or in the furnishing of facilities or services in connection therewith based on disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(2).

117.    Defendants' conduct, as described above, constitutes printing or circulating or causing to be printed or circulated a statement, advertisement, publication, or using a form of application for rental, or making a record or inquiry in conjunction with a prospective rental, which expresses, directly or indirectly, a limitation, specification, or discrimination, or an intent to make such limitation, specification, or discrimination based on disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(3).

118.    Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

119.    Defendants' conduct was intentional, willful, and made in reckless disregard for the rights of others.

## COUNT IV

New York City Human Rights Law:
Discrimination based on Disability, Religion, Race, and Color
(New York Administrative Code § 8-107 *et seq.*)

120.    Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

121.    Defendants' facilities have been places of public accommodation as defined by Section 8-102(9) of the New York City Administrative Code

122.    Defendants own and lease housing accommodations, as defined by Section 8-102(10) of the New York City Administrative Code to include "any building . . . which is used or occupied . . . as the home, residence or sleeping place of one or more human beings."

123.    The New York Court of Appeals has recognized that "the NYCHRL was intended to be more protective than the state and federal counterparts . . . with the aim of making it the most progressive in the nation." *Makinen v. City of N.Y.*, 30 N.Y.3d 81, 88 (N.Y. 2017) (cleaned up). In *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62 (1st Dep't 2009), for example, the Appellate Division "adopt[ed] a new . . . standard for determining liability" in favor of a new standard "that 'is most faithful to the uniquely broad and remedial purposes of [the statute]'"— even "without any input from the parties concerned." *Id.* at 83 (Andrias, J., concurring); *see also id.* at 78. The majority opinion in *Williams* was one of three opinions ratified by the Restoration Act as having "correctly understood and analyzed the liberal construction requirement of . . . [8-130] and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of [the NYCHRL]." N.Y.C. Admin. Code § 8-130(c).

124.    Defendants' conduct, as described above, constitutes refusing to rent or lease, refusing to approve the rental or lease, or otherwise denying or withholding a housing

accommodation because of disability, in violation of New York Administrative Code § 8-107(5)(a)(1).

125.    Defendants' conduct, as described above, constitutes discrimination in the terms, conditions, or privileges of the rental of a housing accommodation because of disability, in violation of New York Administrative Code § 8-107(5)(a)(2).

126.    Defendants' conduct, as described above, constitutes declaring, printing, or circulating a statement, advertisement, publication, or using a form of application for rental, or making a record or inquiry in conjunction with a prospective rental, which expresses, directly or indirectly, a limitation, specification, or discrimination, or an intent to make such limitation, specification, or discrimination based on disability in violation of New York Administrative Code § 8-107(5)(a)(3).

127.    Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

128.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

129.    Accordingly, under the New York Administrative Code § 8-502(a) and (f), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

130.    Plaintiff is complying with the notice requirements of the New York City Human Rights Law by serving a copy of the complaint upon the City Commission on Human Rights and Corporation Counsel on March 5, 2025, contemporaneously with the filing of this action, pursuant to the New York City Administrative Code § 8-502(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

    (a)   Declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the New York State Human Rights Law, New York Executive Law § 290 *et seq.*; and the New York City Human Rights Law, New York Administrative Code § 8-107 *et seq.*

    (b)   Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation from discriminating on the basis of disability, including the following:

        (i)   Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination;

        (ii)   Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact available;

        (iii)   Denying or withholding housing or otherwise making housing unavailable on the basis of disability;

        (iv)   Discriminating in the terms, conditions, or privileges of rental;

        (v)   Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling;

(vi)   Refusing to administer programs in a manner that does not discriminate against people with disabilities;

(vii)   Refraining from inquiring about a potential resident's use of a wheelchair or other assistive mobility devices or incontinence during the application process, including during the site tour or in the application materials; initial telephone inquiries, tours, meetings or other informal interactions occurring before an assessment that is intended to develop a plan of care and determine any necessary accommodations; and

(viii)   Using criteria or methods of administration the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their federally assisted program or activity for qualified individuals with a particular handicap.

(c)   Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future.  Such affirmative steps should include, but are not limited to, the following:

(d)   Make all necessary modifications to their policies, practices, and procedures to comply with the Fair Housing Act, the Rehabilitation Act, the New York State Human Rights Law; and the New York City Human Rights Law.

(i)   Eliminate the use of a "no wheelchair" policy;

(ii)   Eliminate the use of a "no motorized wheelchair" policy;

(iii)   Eliminate any policies that preclude the use of other mobility devices;

(iv)    Eliminate the use of a policy barring individuals who are incontinent;

(v)     Develop appropriate criteria for pre-admission screening of ACF residents based solely on resident suitability factors (e.g., level of needed assistance with activities of daily living);

(vi)    Develop appropriate, non-discriminatory procedures for readmission of ACF residents who already have admission agreements;

(vii)   Adopt an anti-discrimination policy prohibiting discrimination based on race, religion, sex, sexual orientation, national original, genetic information, and disability, and in particular the use of wheelchairs and other mobility devices or the use of incontinence aids;

(viii)  Train all management, agents, and employees on the Fair Housing Act, the Rehabilitation Act, New York State Human Rights Law; and New York City Human Rights Law;

(ix)    Advertise available apartments and rooms and/or other available placements in a non-discriminatory manner, including displaying an Equal Housing Opportunity logo (or statement to that effect) on all print and internet advertisements and displaying in all offices and facility buildings appropriate fair housing law posters;

    (x)    Use human models on websites and in other marketing materials that depict residents with mobility disabilities, including residents who use wheelchairs;

    (xi)    Allow monitoring of their application, admission and retention process;

    (xii)    Retain advertising, application, admission, and retention records to allow for appropriate monitoring;

    (xiii)    Develop written procedures on application, admission and retention process and fair housing policy to be distributed to all employees, agents, residents, and applicants;

    (xiv)    Establish a system for testing agents and employees for unlawful discriminatory practices; and

    (xv)    Submit any changes to Defendants' admissions policies for FHJC and court approval.

(e)    Awarding such damages to Plaintiff FHJC as will fully compensate for the diversion of resources and frustration of mission caused by Defendants' unlawful practices;

(f)    Awarding punitive damages to Plaintiff;

(g)    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

(h)    Granting Plaintiff such other further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated: New York, New York

March 5, 2025

EISENBERG & BAUM LLP

By: /s/ David John Hommel
David John Hommel
Andrew Rozynski
Reyna Lubin
24 Union Square East, PH
New York, New York 10003
(212) 353-8700

MOBILIZATION FOR JUSTICE, INC.

By: /s/ Tanya Kessler
Tanya Kessler, Esq. (TK-0940), of counsel
to Tiffany Liston, Esq.
Jota Borgmann, Esq. (JB-1227)
Kevin M. Cremin, Esq. (KC-4319)
100 William Street, 6th Floor
New York, NY 10038
(212) 417-3811

*Attorneys for Plaintiff*